UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Carolyn Upshaw,                    :    Case No. 1:04-cv-760
                                   :
    Plaintiff,                     :
                                   :
vs.                                :
                                   :
Ford Motor Company,                :
                                   :
    Defendant.                     :

**ORDER**

Before the Court is Defendant's motion for summary judgment. (Doc. 64)  Plaintiff opposes the motion (Doc. 67), and Defendant has replied.  (Doc. 70)  Plaintiff generally alleges that Defendant discriminated against her, and then unlawfully terminated her employment in retaliation for her prior EEOC complaints of workplace discrimination.

**FACTUAL BACKGROUND**

Carolyn Upshaw began working for Ford Motor Company in April 2000.  She was hired to work in Ford's Michigan truck plant; for personal reasons, Upshaw sought and was granted a transfer to the Sharonville Transmission Plant.  Upshaw worked at Sharonville from the spring of 2001 until her termination in March 2005.  Her job throughout her tenure with the company was Production Supervisor, a Grade 6 position.  There is no dispute that her written job reviews were generally positive, including several years of "Excellent" performance ratings.  (See Doc. 64, Exhibit

-1-

9, Upshaw's written performance reviews.)  Despite these reviews, Upshaw was not promoted to a higher grade level.

Ford awards promotions in two ways, which it calls "in-series" and "non-series."  The in-series promotion process is generally overseen by Ford's Salaried Personnel department; Robert Brooks was the supervisor of that department during Upshaw's employment in Sharonville.  An in-series promotion is the process for salaried employees to gain promotions by moving up salary grades within their job description.  Job performance and length of service are the key factors used for in-series promotion decisions, according to Brooks' testimony.  A "non-series" promotion involves a move from one job to another, or a change or increase in job duties (in a reorganization, for example).

Brooks testified that he raised the standards for in-series promotions when he became the Salaried Personnel supervisor in early 2002.  Under this new policy, employees needed at least an "Excellent Plus" rating on their annual review, and had to have been in their current salary grade for at least 24 months, to be considered for an in-series promotion.  (See Brooks Deposition pp. 15-16 and Exhibit 27.)  Ford's overall performance rating included seven levels, from "Outstanding" (the best rating) to "Unsatisfactory" (the worst, generally leading to reassignment or termination).  "Excellent Plus" was just below "Outstanding,"

followed by "Excellent" and "Satisfactory Plus."

Upshaw's January 2002 job review, covering the previous calendar year, rated her overall performance as "Satisfactory Plus;" she received an "Excellent" rating in her January 2003 review.  Upshaw admits these reviews were fair, although she did not agree with all of the comments included in the written reviews.

Upshaw's First EEOC Charge.

On July 21, 2003, Upshaw received a mid-year interim review, which rated her only as "Satisfactory."  (Upshaw Deposition Exhibit 5.)  According to Ford, the interim reviews are intended to assist employees in achieving yearly job improvement goals, and are not used to consider promotions or salary increases (which are done only once a year based on annual reviews).  Upshaw refused to sign her interim review because she disagreed with it.  The written comments with which she disagreed stated that she had recently been reassigned to a different location for two reasons. One was to permit her to operate in a

> . . . slower paced environment where she
> could spend more time becoming familiar with
> her new assignment and gain the necessary
> process expertise that would enable her to
> address the accountability issues that are
> inherent to this business.  Two, that her new
> assignment would offer Carolyn a fresh start
> and a different look; one that could expand
> her knowledge of the converter business by
> affording her machining exposure.

Upshaw filed a charge with the EEOC on August 13, 2003,

-3-

contending that Ford denied her promotion to Grade 7 despite her qualifications, and that Ford promoted white male Production Supervisors with the same or lower qualifications.  Ford responded that nine of the ten employees who were promoted to Grade 7 between January 1, 2000 and July 1, 2003 were rated Excellent Plus; only one (an African-American employee) was rated Excellent.  There is no mention in Ford's response of a two-year service time requirement.  The EEOC dismissed Upshaw's charge shortly thereafter.

During discovery in this case, Robert Brooks admitted that Ford's response to the EEOC was incorrect, because the wrong year's performance ratings had been used to prepare the chart. In fact, two white males had been promoted in the spring of 2002 although their ratings were "Excellent," not the required "Excellent Plus."  Brooks ascribed this error (both in awarding the promotions in the first place and in reporting incorrect information to the EEOC) to his failure to double-check his assistant's recording of the relevant data.  Brooks freely admitted, however, that he was ultimately responsible for the error.  The EEOC was not informed of this error in Ford's response, and Brooks testified that he did not learn of the error until sometime during this litigation.  (Robert Brooks Deposition pp. 17, 22, 25-26, and 64-65.)

Gerald Taylor is Ford's Human Relations Personnel Manager

-4-

for four of Ford's plants, including Sharonville; he is based in
Dearborn, Michigan.  On August 26, 2003, shortly after Ford
received Upshaw's first EEOC charge, he talked with Robert Brooks
and with James Brooks (also an HR salaried employee
representative in Sharonville) about Upshaw.  His written note of
that date indicates they discussed

> . . . the possibility of looking into the
> complaint activity of Carolyn Upshaw since it
> seems almost daily people are investigating
> her complaints.  The # of complaints, time
> invested & outcome of these investigations.
> [sic]  That if the data reveal excessive
> activity w/ little or no results then write
> it up for termination and I will evaluate if
> it warrants said release.

(Taylor Deposition p. 22 and Exhibit 55; Doc. 68 Exhibit G)
Sometime in October 2003, after the EEOC formally dismissed
Upshaw's August 2003 charge, another Ford HR employee (Brandee
Hughes) began compiling an event "timeline" of Upshaw's
employment, to compile the data mentioned in Taylor's note.

        Upshaw's Second EEOC Charge.

        Doug Baur, Upshaw's immediate supervisor, held a meeting
with Upshaw's shift employees in January 2004, which Upshaw
contends was without her knowledge and in her absence.  Upshaw
alleges that Baur treated her differently from other supervisors,
and was trying to undermine Upshaw's relationship with her hourly
employees.  Upshaw filed her second EEOC charge on January 28,
2004, citing Baur's undisclosed employee meeting and contending

it was in retaliation for her August 2003 EEOC charge. Ford's response to the EEOC states that only two Sharonville managers were aware of Upshaw's charge: Robert Brooks and James Brooks. Ford also noted that Upshaw's complaint of differential or retaliatory treatment was too vague to respond to in any detail. The EEOC dismissed Upshaw's complaint and issued her a 90-day letter. She did not file suit.

During discovery in this case, Ford produced internal emails which Upshaw argues establish that Ford's EEOC response was false. Several internal emails mention the fact of Upshaw's EEOC claims. Upshaw cites one September 18, 2003 email from Campbell to Baur noting that Upshaw "has opted to pursue her frustrations outside the company . . .", an apparent reference to her EEOC charge. Further, Baur testified that he was told about her EEOC charges, but could not remember when he learned about them. (Baur Deposition p. 23; Doc. 70 Exhibit L.)

Upshaw Files a Third EEOC Charge.

On June 3, 2004, Upshaw was formally disciplined for an incident that occurred earlier that year, involving her failure to wear a brightly-colored safety vest in an area of the plant requiring such vests. Upshaw stated that she had been wearing the vest, but that it was covered by her coat, which Upshaw contended was a common practice. (Upshaw admitted in her deposition in this case that she had violated Ford's safety

-6-

policy concerning safety vests, because it was not properly
visible under her coat.)  After some investigation, Ford issued a
written reprimand.  Some time later, Upshaw saw the employee who
had previously reported her, walking without a safety vest in an
area requiring one.  The employee had self-reported his lapse,
but when Upshaw reported it to management, she was told that he
was counseled and that no written reprimand or other formal
discipline was issued.

Upshaw filed a third EEOC charge on June 15, 2004 based on
the safety vest incident, contending that her discipline was
retaliatory.  She argues (and Ford does not dispute) that she is
the only supervisor who has been formally disciplined for this
safety infraction, which she alleges is a not uncommon
occurrence.  Ford responded to the EEOC with a list of seven
salaried employees who had been disciplined for "violation of
Corporate Safety Rules," which Ford described as the "same
violation" as that charged against Upshaw.  Four of those
employees were Caucasian.  Again the EEOC dismissed Upshaw's
charge.

Upshaw contends that Ford again misrepresented facts to the
EEOC, because she learned in discovery that several of the safety
violations Ford listed were failures to lock out/tag out
machinery, which Upshaw characterizes as far more serious
infractions than her failure to visibly wear her safety vest.

Despite this difference, Ford told the EEOC that Upshaw's violation was the "same" as the lock out/tag out violations.

On December 7, 2004, Brandee Hughes (in Sharonville HR) emailed Gerald Taylor, asking for a conference call concerning Upshaw, because James Brooks was recommending to Taylor that Upshaw be terminated. Taylor testified that he received Brooks' recommendation but took no immediate action on it. (Taylor Deposition pp. 31, 38-39.) Before Taylor acted on the recommendation, other events involving Upshaw took place.

Events Precipitating Upshaw's Termination.

A series of incidents that occurred from January through March 2005 were cited by Ford as the basis for Upshaw's formal termination, according to James Brooks' written summary dated March 23, 2005. (Doc. 68, Taylor Deposition Exhibit 32)

The first incident arose from Upshaw's "scrap reports." "Scrap" consists of manufactured parts that fail to meet specifications and cannot be used. Ford requires accurate accounting for "scrap" on each shift for cost, quality, and inventory control purposes. Upshaw's performance reviews consistently identified "scrap reduction" as an area of needed improvement.

David Gibson, a union hourly employee, was the coordinator for Upshaw's department. One of his jobs was to actually count the number of scrap parts at the end of every shift and report

-8-

those numbers to the production supervisor, who in turn would input the information into Ford's inventory data system.   On January 10, 2005, Gibson reported to his union representative that he had documented Upshaw's intentional under-reporting of scrap numbers on four shifts the previous week.   Gibson had also worked a Saturday shift when Upshaw was off, and another supervisor was on duty.   Gibson stated that the other shift supervisor was reporting the exact scrap numbers Gibson had recorded, whereas Upshaw had reported much lower scrap numbers.

Gibson further stated that Upshaw called him at home when she discovered the scrap numbers that had been reported on the Saturday she did not work.   Upshaw told Gibson that the higher numbers were "unacceptable" and that she would do the scrap count by herself from now on.   Gibson also reported that Upshaw harassed him and retaliated against him because he refused to falsify her shift scrap numbers.   (Gibson's written statement, dated January 13, 2005, is attached as Exhibit 1 to the Declaration of James Brooks, Doc. 64.)   Ford investigated Gibson's allegations and concluded they had merit.   Upshaw admitted in her deposition that Gibson's scrap numbers did not match the numbers she officially entered on January 4, 5, 6 and 7, 2005.   (Upshaw Deposition pp. 108, 115-119 and Exhibit J to Doc. 64.)

The next events were a series of incidents in which Upshaw

-9-

drove a personnel scooter that had not been properly inspected.
Ford's safety regulations concerning these vehicles (called
"PMHVs") require supervisors to complete an inspection and report
the results prior to use.  (James Brooks Declaration, Exhibit 3)
Upshaw had been counseled about this conduct in May 2004.  She
again was found driving an uninspected scooter on February 8,
2005, after which she was counseled again.  But on February 11,
2005, two union representatives reported her in violation.  And
again on February 15, two management personnel who were on a
safety tour discovered Upshaw driving an uninspected scooter.
Ford characterized the four incidents as a reflection of Upshaw's
"total disregard for safety."  (Taylor Deposition, Exhibit 32 at
p. 4.)

The final incident cited by Ford's termination memorandum
took place on March 1, 2005.  A union representative presented
Upshaw with a list of 16 health and safety complaints.  Ford
describes this as standard bargaining agreement procedure, and
that one of a supervisor's duties is to promptly respond to such
complaints brought to his or her attention by the union.
According to the union representative, Upshaw refused to accept
the list, telling him that health and safety was the
superintendent's job, and not hers.  Upshaw's supervisor was
contacted, and Upshaw was told she needed to respond, and she
said she would.  However, she again refused to discuss the list

-10-

with the union representative, requiring intervention from a zone superintendent, who directed Upshaw to walk the area, to note needed corrective actions, and to sign and return the list to the safety department within 24 hours.  Upshaw failed to follow these instructions, as she did not describe the needed corrective actions and did not sign the complaint form.  Ford characterizes Upshaw's conduct as both a violation of company safety rules and insubordination.

All four incidents were cited by James Brooks in the March 23, 2005 summary of the termination recommendation, a recommendation with which Taylor agreed.  After additional management and legal approvals, Upshaw was terminated; her last day with Ford was March 29, 2005.

Procedural History.

After she received the EEOC's right to sue letter following her EEOC charge of June 15, 2004, Upshaw timely filed a complaint in this court alleging various state and federal causes of action, all generally contending that Ford discriminated and retaliated against her.

After Upshaw's employment was terminated, she filed a retaliatory discharge claim with the EEOC on March 30, 2005.  She thereafter amended her complaint in this case (Doc. 23), adding wrongful and retaliatory discharge claims.

**ANALYSIS**

1.   <u>Summary Judgment Standards</u>.

The standards for summary judgment are well established.
Summary judgment is proper "if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a
judgment as a matter of law." Fed.R.Civ.P. 56(c). The party
opposing a properly supported summary judgment motion "'may not
rest upon the mere allegations or denials of his pleading, but
... must set forth specific facts showing that there is a genuine
issue for trial.'" <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 248 (1986) (quoting <u>First Nat'l Bank of Arizona v. Cities
Serv. Co.</u>, 391 U.S. 253 (1968)). The Court is not duty bound to
search the entire record in an effort to establish a lack of
material facts. <u>Guarino v. Brookfield Township Trs.</u>, 980 F.2d
399, 404 (6th Cir. 1992); <u>InterRoyal Corp. v. Sponseller</u>, 889
F.2d 108, 111 (6th Cir. 1989), <u>cert. den.</u>, <u>Superior Roll Forming
Co. v. InterRoyal Corp.</u>, 494 U.S. 1091 (1990). Rather, the
burden is on the non-moving party to "present affirmative
evidence to defeat a properly supported motion for summary
judgment...," <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479-
80 (6th Cir. 1989), and to designate specific facts in dispute.
<u>Anderson</u>, 477 U.S. at 250. The non-moving party "must do more

-12-

than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Electric Industries Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. <u>United States v. Diebold Inc.</u>, 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Id</u>. at 250. "If the evidence is merely colorable, . . . , or is not significantly probative, . . . , the court may grant judgment." <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, <u>Smith v. Hudson</u>, 600 F.2d 60, 63 (6th Cir. 1979), <u>cert. dismissed</u>, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'"

-13-

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986) (citations omitted).

2.  <u>Plaintiff's Discrimination Claims</u>.

Upshaw alleges claims under Title VII (42 U.S.C. §2000e et seq.), Ohio Rev. Code 4112.02, and 42 U.S.C. §1981.  The same legal standards govern the analysis of discrimination claims under federal and Ohio law.  <u>Mitchell v. Toledo Hospital</u>, 964 F.2d 557, 582 (6th Cir. 1992).

Upshaw frequently cites her gender as a reason for Ford's alleged discriminatory treatment.  However, her amended complaint specifically limits her causes of action to racial discrimination, and her opposition to Ford's motion does not expressly argue nor present cogent evidence that her claims are premised upon her gender rather than her race.  The Court will therefore analyze her claims solely as based on racial discrimination.

Upshaw presents no direct evidence of racial discrimination, and proceeds under the well-established <u>McDonnell-Douglas</u> rubric for indirect evidence claims.  A prima facie case of racial discrimination is established when plaintiff shows: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position lost; and (4) her position was filled by someone outside of the protected class, OR that she was treated less favorably than a

similarly-situated employee outside of her class.  See, e.g., Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir. 2002).  To show that another employee is "similarly-situated," plaintiff must establish that all relevant aspects of her employment situation were substantially similar to that of the other employee.  Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998).

The precise contours of a prima facie case will vary depending on the facts, and the requirements were "'never intended to be rigid, mechanized, or ritualistic.'"  Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)).  Plaintiff's prima facie burden is not onerous, but simply raises a rebuttable presumption of discrimination.  Cline v. Catholic Diocese, 206 F.3d 651, 660 (6th Cir. 2002) (internal citations and quotations omitted).

Once plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Plaintiff must then show that the employer's articulated reason is mere pretext.  Plaintiff can establish pretext by showing (1) the employer's reason has no factual basis; (2) the reason did not actually motivate the employer; or (3) the articulated reason is insufficient to justify the adverse action taken.  Wexler v.

-15-

White's Fine Furniture, Inc., 317 F.3d 564, 576 (6th Cir. 2003).

    A.   Plaintiff's Affidavit.

    Before discussing the merits, the Court must address Upshaw's lengthy affidavit filed in opposition to Ford's summary judgment motion.  The affidavit is 44 pages long, and attaches 120 pages consisting of 51 separate exhibits.  Many paragraphs are simply legal argument, or consist of Ms. Upshaw's own view of the meaning of documents or the testimony of witnesses.  (See, e.g., ¶¶ 10, 14, or 29.)  She also attempts to embellish or even contradict her deposition testimony (e.g. ¶15); she repeatedly attempts to justify her own conduct and her responses to Ford's disciplinary actions; and she ascribes ulterior motives to almost every Ford employee involved in her relationship with the company.

    It is beyond dispute that a plaintiff cannot create an issue of fact by an affidavit contradicting prior deposition testimony. See Biechele v. Cedar Point, 747 F.2d 209, 215 (6th Cir. 1984). Moreover, the lengthy affidavit essentially recites Ms. Upshaw's personal views on her employment history.  The function of an affidavit is not to argue a position or to draw legal conclusions from the evidence, but to present facts or to authenticate documents.  The relatively few sections of Ms. Upshaw's affidavit that may achieve those functions are buried within the lengthy document.  As the Seventh Circuit has aptly noted, "Judges are

-16-

not like pigs, hunting for truffles buried in briefs." U.S. v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991). The observation applies with greater force to a party's own self-serving affidavit. The Court has not considered Plaintiff's affidavit, but will rely on the evidence properly in the record, including the deposition testimony, documents properly authenticated, and other declarations that may provide relevant evidence.

B. Failure to Promote.

Ford argues that Upshaw was not qualified for a promotion to Grade 7, and qualification is a part of her prima facie burden in a failure to promote situation. See, e.g., White v. Columbus Metro. Housing Authority, 429 F.3d 232, 240 (6th Cir. 2005). Ford notes that in 2002, the year in which two white males with "Excellent" ratings were (mistakenly) promoted to Grade 7, Upshaw's performance rating was "Satisfactory Plus." She thus did not qualify for promotion even assuming that an "Excellent" rating was sufficient to earn one. However, Ford does not dispute that it promoted another African-American employee with an "Excellent" rating. Given the facts that the white employees were in fact promoted despite Ford's announced policy, and given that Upshaw's prima facie burden is not intended to be onerous, the Court will assume for purposes of summary judgment that she has established a prima facie case on this issue. As Ford has presented a legitimate justification for its decision, Upshaw

-17-

must establish pretext.  She largely relies on the facts that the two white males were promoted to Grade 7; that a different white employee was given a "non-series" promotion in 2005; and that Brooks admitted that Ford's response to the EEOC was false.  None of these are sufficient to raise a genuine issue of material fact concerning pretext.

Ford freely admits that the 2002 promotion of the two white males violated Brooks' newly-established policy concerning in-series promotions.  Brooks described how the mistake occurred. Upshaw asks this Court to disbelieve these explanations because she thinks that Ford is not telling the truth.  A plaintiff may not simply deny an employer's explanation in order to establish pretext.  In <u>White</u>, for example, the plaintiff alleged she was not promoted when her employer hired an outside male candidate. Plaintiff attempted to establish pretext by arguing that her employer had accepted the winning candidate's application after the deadline had passed, and that the candidate's hiring violated several internal policies, including a preference for internal candidates, an anti-nepotism policy, and a background check requirement.  The Sixth Circuit noted that, even if all of White's allegations were true, they would not establish that CMHA's legitimate reasons were a cover for a discriminatory motive.  "The most White can show, in viewing the evidence in the light most favorable to her, is that her application was not

-18-

given as much attention as she would have liked.  However, she has not presented sufficient evidence for this court to conclude that the true reason behind the lack of attention is the fact that she is a woman." <u>White v. Columbus Metro</u>., 429 F.3d at ___. The Court reaches the same conclusion here: Ford's mistake in promoting two employees in 2002 is simply insufficient to raise a genuine question about Ford's motives.

The 2005 non-series promotion of another white employee is simply inapplicable to Upshaw's complaints.  Brooks explained the differences between in-series and non-series promotions, an explanation which Upshaw does not contest.  The 2005 promotion was due to job reorganization, and Brooks testified that if Upshaw had been employed with Ford at that time, she also would have received the non-series promotion.  Upshaw simply argues that the differences between non-series and in-series promotions are a "red herring" that this Court should ignore.  Again, Upshaw's personal beliefs about the wisdom of Ford's personnel policies are an insufficient basis upon which to conclude she has established pretext.

Finally, Upshaw points to Brooks' admission that his EEOC response was inaccurate, contending this is proof of deceptive intent or discriminatory animus toward Upshaw.  A factual misstatement to the EEOC is always of concern.  Ford does persuasively note that the essential mistake on the August 2003

written response was the use of the wrong year's performance ratings; the white employees who had been promoted in 2002 were shown with "Excellent Plus" ratings, rather than "Excellent" which they had earned. Upshaw's rating that same year was "Satisfactory Plus" but Ford's EEOC response listed her at "Excellent." In that sense, Ford's statement that the promoted employees were performing at a higher level than Upshaw was technically correct, although Ford did not make it clear that the two employees had been promoted when achieving only "Excellent" ratings. (The Court views this as irrelevant in any event, as Upshaw would not have been promoted on the correct facts.)

But the Court cannot conclude, based on Brooks' testimony and the erroneous statement to the EEOC, that Ford's explanation is a pretext for racial discrimination aimed at Upshaw. As noted above, Ford did promote another African-American employee to Grade 7. And Upshaw attacks Ford's explanation for the erroneous EEOC report with only her own subjective interpretation of the facts. As with her reliance on the fact of the promotions discussed above, Upshaw's opinions and conclusions about Ford's motives are insufficient to establish a genuine disputed fact. The Court concludes that Upshaw has failed to establish that Ford's decision not to promote her to Grade 7 was anything but a legitimate business decision, and was not motivated by racial discrimination.

C.  <u>Discriminatory Treatment</u>.

Upshaw contends that essentially all of Ford's actions towards her constituted racial discrimination, because no other Ford production supervisors were treated as harshly as she was. She cites the August 2003 discussion among Taylor, Robert Brooks and James Brooks concerning "complaint activity;" the compilation of a timeline that was begun in October 2003 by Ms. Hughes; the "hoarding" of memos and emails from other employees to document their interactions with her; Baur's meeting with her employees in January 2004; Ford's transfer to day shift of two white males but its refusal to transfer Upshaw; and the disciplinary actions in early 2005, all of which Upshaw contends display racial animus towards her.  The Court again notes that Upshaw's own perceptions about the reasons for all of these decisions are not sufficient to raise a genuine question of disparate treatment.  Moreover, Upshaw has failed to establish that other supervisors who engaged in the same conduct that she did were treated preferentially. Several Ford employees testified that they were unaware of any other supervisor who had engaged in the same type of conduct.

Upshaw also submits declarations from two former employees, Cosby Calbert and Tracy McCullough, who describe a "good ol' boys" atmosphere at the Sharonville plant, where women and minorities were generally disfavored.  Mr. Calbert worked for 32 years as a Grade 7 production supervisor before his retirement;

-21-

Ms. McCullough voluntarily resigned from Ford before Upshaw arrived at Sharonville. Their opinions about the general atmosphere of the plant, or their own experiences during their employment, do not constitute reliable evidence supporting Upshaw's contention that Ford's explanations for the actions and decisions it made concerning Upshaw's tenure with the company are mere pretext for racial discrimination.

3. Plaintiff's Retaliation Claims.

A prima facie case of retaliatory discharge is established with evidence that: 1) Plaintiff engaged in protected activity; 2) Defendant knew that Plaintiff had engaged in such activity; 3) Defendant made an employment decision adversely affecting Plaintiff; and 4) there is a causal link between Plaintiff's protected activity and Defendant's adverse employment action. Singfield v. Akron Metro. Housing Authority, 389 F.3d 555, 562 (6th Cir. 2004). "The causal link element requires merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated." EEOC v. Avery Dennison Co., 104 F.3d 858, 861 (6th Cir. 1997) (internal citations and quotations omitted). The burden of establishing a prima facie case is "easily met." Id.

The only dispute concerning her prima facie case is whether Upshaw has established a causal link between her EEOC charges and the increased level of scrutiny she was allegedly subjected to,

-22-

and/or her ultimate termination from the company.  Taylor's
handwritten notes, and his discussion about Upshaw's potential
termination with James Brooks and Robert Brooks, occurred within
days of Ford's knowledge of Upshaw's August 2003 EEOC charge.
Ford argues that the temporal connection between the protected
activity and the adverse employment action must be close; it
suggests that the long gap between August 2003 and March 2005,
when Upshaw was finally terminated, is simply too long to support
an inference of a causal link.  Ford also argues that none of the
disciplinary actions taken before March 2005 were "materially
adverse" to Upshaw, in that she was not demoted nor deprived of
any already-accrued benefits.  While Upshaw's termination came
almost 19 months after her initial EEOC charge, Upshaw made two
additional charges and filed her lawsuit only four months before
she was fired.  Given the facts discussed above, and the
relatively easy burden of establishing a prima facie case, the
Court assumes for purposes of summary judgment that Upshaw could
raise an inference that her charges and her termination were not
"wholly unrelated."

     Ford has clearly established a legitimate business reason
for her termination.  The series of incidents occurring in
January, February and March of 2005 were serious, and even Upshaw
admits that falsification of records, or harassment of a union
employee, justifies termination.  And while she attacks Ford's

discipline, she does not deny that the incidents in fact took place. The question is whether Upshaw has shown that Ford's actual motivation to fire her was retaliatory, rather than reasons Ford stated. The Court concludes that Upshaw has not established that Ford's stated reasons were a pretext for retaliation against her.

Gerald Taylor testified that his August 2003 note referred to a then-existing history of complaints by Upshaw against various other employees, as well as complaints by other employees about Upshaw's behavior. This testimony is borne out by the emails submitted with Ford's reply brief, which document many incidents and complaints involving Upshaw prior to August 2003. Taylor's reference to her "complaint activity" and the later compilation of information about that activity can easily be understood in the context of that history.

Upshaw also asserts that Taylor had decided to terminate her employment in December 2004, before any of the four events that Ford later used to justify her termination actually took place. She argues this is further evidence of Ford's "true" motivation. However, Taylor's actual testimony does not support Upshaw's assertion. Taylor testified that he received a termination recommendation from the Sharonville salaried personnel department in December 2004 (James Brooks and Brandee Hughes), but he did not act upon it nor come to any decision about it at that time.

Upshaw labels Ford's justification for her termination as baseless and retaliatory because no other supervisor had been terminated for the four offenses.  While Upshaw offers several excuses for the scrap report discrepancies, she ultimately admitted that the numbers she reported were significantly lower than the numbers resulting from the actual count.  This happened on four successive shifts, and was not a single isolated occurrence.  Upshaw offers affidavits from former Ford employees (Cosby Calbert and Mike Rubin) who state that no other production supervisor was terminated for "inaccurate" or "incorrect" scrap numbers.  That may be true, but Ford concluded that Upshaw <u>deliberately</u> and <u>intentionally</u> submitted false scrap numbers, because she was concerned about the actual numbers being too high.  That is a far different situation from an inaccurate or incorrect report.

Upshaw also criticizes Ford's reaction to her admitted conduct of driving an uninspected scooter, again arguing that no other supervisor was terminated for the same offense.  Yet she does not dispute that she engaged in that behavior on three separate occasions within one week, and even <u>after</u> being specifically counseled about the issue after the first incident on February 8.  Upshaw has no evidence that any other Ford employee flaunted this work rule in such a fashion, and was not disciplined for it.

With regard to the list of health and safety violations that the union representative gave her March 1, Upshaw contends that these violations were usually brought up during day shift. She argues that it would have been impossible for her to make sure that each and every complaint was responded to before the end of her shift. But Ford's description of the incident states that the supervisor's job is to <u>document</u> the concern and note appropriate corrective actions. The recommended actions are then given to Upshaw's supervisor and are performed by appropriate plant personnel. The evidence does not support Upshaw's inference that she was unfairly blamed for her failure to complete all of the corrective actions. Ford cited her for her initial refusal to cooperate with the union representative, and then her failure to properly complete the form after the walk-through with the union. Upshaw does not dispute these facts, but offers excuses for why she did not do what she was supposed to do.

Upshaw also argues that her direct supervisor did not cite her for insubordination after that incident. She contends that salaried personnel representatives unfairly seized on the incident as the "final straw" to "gunny-sack her" - to compile enough incidents to justify her termination. Maria Bradfish (Upshaw's supervisor at the time) testified that she had a previous problem with Upshaw involving the same form, so Bradfish

knew that Upshaw was aware of the proper procedure for responding to safety complaints. Bradfish confirmed that Upshaw did not properly complete the form during the March 2005 incident. (Bradfish Deposition p. 43.) The fact that Bradfish did not cite Upshaw for insubordination would not prevent Ford management from imposing discipline, if management believed the incident was serious enough. Moreover, Bradfish specifically reported Upshaw's conduct to management in a March 4 email, describing the incident as one of "High Importance." Ford's UAW contract states that union representatives "shall" discuss safety complaints directly with production supervisors. Given all of these facts, Upshaw's argument that Bradfish did not cite her for insubordination does not diminish the seriousness of Upshaw's conduct, nor suggest that Ford's response was simply a pretext for retaliation.

Upshaw repeatedly returns to her contention that no other supervisor was terminated for engaging in a single violation of inaccurate scrap reports, or for driving an uninspected scooter, or for a run-in with a union representative. Therefore Ford's actual motive in terminating her employment must have been to retaliate against her. Upshaw does not acknowledge that her termination was based upon **all** of these incidents, and not upon any one of them taken alone. Her own excuses and thinly-woven conspiracy theories do not establish a genuine issue of disputed

fact that Ford's justification for her termination was anything
other than legitimate.  See, e.g., <u>Wade v. Knoxville Utilities
Board</u>, 259 F.3d 452, 463 (6th Cir. 2001) (internal citation
omitted), noting that a plaintiff's conclusory allegations, his
own perceptions of the events, and his subjective assessment are
insufficient to stave off summary judgment.

The Court therefore concludes that Upshaw has failed to
carry her burden of producing evidence of pretext, and that Ford
is entitled to judgment on her retaliation and retaliatory
discharge claims.

4.  <u>Plaintiff's Public Policy Claim</u>.

Upshaw's complaint includes a claim for wrongful discharge
in violation of Ohio public policy.  Ford seeks summary judgment
on this claim, arguing that the federal and state statutory
remedies under Title VII and O.R.C. 4112 supplant any claim based
on general Ohio public policy.  See <u>Wiles v. Medina Auto Parts</u>,
96 Ohio St.3d 240, 2002 Ohio 3994 at ¶15 (court should not
recognize a common law public policy claim if adequate statutory
remedies otherwise exist).

Upshaw does not directly address this argument, but simply
cites <u>Greely v. Miami Valley Maint. Contractors</u>, 49 Ohio St.3d
228 (Ohio 1990), which sets forth the elements of an Ohio public
policy claim.  She does not suggest any other basis upon which
her claim should survive in view of the adequate statutory

remedies of Title VII.  Given the Ohio Supreme Court's decision in <u>Wiles</u>, the Court grants summary judgment to Ford on Upshaw's public policy claim.

## CONCLUSION

For all of the foregoing reasons, Ford Motor Company's motion for summary judgment is granted in all respects.

SO ORDERED.

DATED: June 28, 2007                    <u>s/Sandra S. Beckwith</u>
                                        Sandra S. Beckwith, Chief Judge
                                        United States District Court