*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0284p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

CAROLYN UPSHAW,

*Plaintiff-Appellant,*

*v.*

No. 08-3246

FORD MOTOR COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 04-00760—Sandra S. Beckwith, District Judge.

Argued:  April 22, 2009

Decided and Filed:  August 14, 2009

Before:  BATCHELDER, COLE, and SUTTON, Circuit Judges.

————————————

**COUNSEL**

**ARGUED:** Matthew Colangelo, NAACP LEGAL DEFENSE & EDUCATIONAL FUND,
INC., New York, New York, for Appellant. David A. Whitcomb, BAKER & HOSTETLER
LLP, Columbus, Ohio, for Appellee. **ON BRIEF:** Matthew Colangelo, NAACP LEGAL
DEFENSE & EDUCATIONAL FUND, INC., New York, New York, Kenneth G. Hawley,
Cincinnati, Ohio, for Appellant.  David A. Whitcomb, BAKER & HOSTETLER LLP,
Columbus, Ohio, for Appellee.

        COLE, J., delivered the opinion of the court, in which SUTTON, J., joined.
BATCHELDER, J. (pp. 26-28), delivered a separate opinion concurring in part and
dissenting in part.

————————————

**OPINION**

————————————

        COLE, Circuit Judge.  In this civil rights action arising under Title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), 42 U.S.C. § 1981, and Ohio
Revised Code § 4112.02, Plaintiff-Appellant Carolyn Upshaw ("Upshaw") appeals the

district court's grant of summary judgment to Defendant-Appellee Ford Motor Company ("Ford") and the denial of her motion for relief from judgment. Upshaw argues that Ford failed to promote her on the basis of her race and sex, and retaliated against her when she complained of discrimination. For the following reasons, we **AFFIRM** in part and **REVERSE** in part.

## I. BACKGROUND

### A. Factual background

#### 1. *Upshaw's employment at Ford*

Carolyn Upshaw, an African-American woman, worked for Ford as a Salary Grade 6 Production Supervisor from April 2000 through her March 2005 termination. Upshaw began her career at Ford in the company's Wayne, Michigan truck plant, but, in 2001, she sought and obtained a transfer to Ford's Sharonville, Michigan transmission plant, where she worked until she was terminated.

At the time that Upshaw transferred to the Sharonville plant, Robert E. Brooks, an African-American male, had recently been promoted to the position of supervisor for salaried personnel, a position within the Department of Human Resources. Brooks's duties included overseeing the "in-series" promotions process, which involves promotion to a higher salary grade within the same job. After Brooks raised the plant's performance standards in 2001, an employee had to have both worked in his current salary grade for at least twenty-four months and received an annual performance rating of "Excellent Plus" or higher to be eligible for an in-series promotion. Ford's performance rating system included seven different levels, ranging from "Outstanding" to "Unsatisfactory." "Excellent Plus" was the level just below "Outstanding," followed by "Excellent" and "Satisfactory Plus." Upshaw received the following performance ratings, with each assessment corresponding to her performance during the previous calendar year: (1) January 2002, "Satisfactory Plus"; (2) January 2003, "Excellent"; (3) January 2004, "Excellent"; and (4) January 2005, "Excellent." Over the course of her employment, Upshaw was repeatedly denied an in-series promotion to Salary Grade 7 production supervisor.

2.   *Upshaw's pre-termination Equal Employment Opportunity Commission ("EEOC") charges and lawsuit*

a.   *August 13, 2003 charge*

On August 13, 2003, Upshaw filed a charge with the EEOC contending that Ford had repeatedly refused to promote her on the basis of her race and sex. She alleged that she was the only Salary Grade 6 production supervisor in her work zone and that Ford had improperly promoted similarly-situated white male production supervisors to Salary Grade 7 while continually denying her the same promotion.

On August 26, 2003, Brooks submitted Ford's response to the EEOC, denying that Ford had discriminated against Upshaw and explaining that nine of the ten employees promoted to Salary Grade 7 between January 1, 2000 and July 1, 2003 had been rated "Excellent Plus," and that the remaining employee had been rated "Excellent." Because Upshaw had been rated "Excellent" rather than "Excellent Plus" on her 2003 performance review, Ford stated that she had not been qualified for an in-series promotion. Ford's response included a chart depicting the Sharonville plant's promotion activity from 2000 through 2003. The EEOC dismissed Upshaw's charge.

During discovery in this action, Brooks admitted that Ford's response to the EEOC was inaccurate because he had used the wrong year's performance reviews in preparing the chart. Although the chart showed all but one of the employees who received an in-series promotion in 2002 as having a rating of "Excellent Plus," in fact, in 2002, two white males, Steven Fletcher and Stephen Green, were promoted from Salary Grade 6 to Salary Grade 7 with ratings of "Excellent." Also, in August 2002, an African-American male, Charles Alexander, was promoted from Salary Grade 6 to Salary Grade 7 with less than an "Excellent Plus" rating.[1] Ford's chart also misstated Upshaw's 2002 rating as "Excellent" when she had actually been rated "Satisfactory Plus."

At his deposition, Brooks attributed the inaccuracies on the chart to his failure to verify the data compiled by an associate in his department. Brooks testified that he

---

[1]Brooks testified in his deposition that although he knew that Alexander had not received an "Excellent Plus" rating in 2002, without reviewing his records, he could not verify whether Alexander had been rated "Excellent" or something lower.

only learned of the mistake after drafting his response to the EEOC, at which point, he realized that Fletcher, Green, and Alexander should not have been promoted.  Brooks never notified the EEOC of the error.

### b.     January 28, 2004 charge

On January 28, 2004, Upshaw filed a second EEOC charge, alleging that in retaliation for her August 2003 EEOC charge, her supervisor, Robert "Doug" Baur, held a meeting with the hourly employees under her supervision without her knowledge. Ford denied Upshaw's claims and argued that only two Sharonville managers (neither of them Baur) were even aware of Upshaw's August 2003 EEOC filing.  Ford also contended that Upshaw's complaint of differential treatment was too vague to allow Ford to respond in any detail.  The EEOC dismissed Upshaw's complaint and issued her a right-to-sue letter, but she did not file a lawsuit within the allotted time.

During discovery in the instant action, Ford produced internal emails to Baur and others that pre-dated Ford's response to the EEOC, mentioning Upshaw's 2003 EEOC charges, which Upshaw asserts establishes the intentional falsity of Ford's EEOC response.  Moreover, Baur testified that he heard about Upshaw's 2003 EEOC charges before Ford drafted its response, but he could not remember the source of the information.

### c.     June 15, 2004 charge

On June 15, 2004, Upshaw filed a third EEOC charge, alleging that on June 3, 2004, she was reprimanded for failing to wear a safety vest in a designated area in retaliation for her previous EEOC complaints.  Ford filed a response with the EEOC listing seven salaried employees (four of whom were Caucasian) who were disciplined for a "violation of Corporate Safety Rules," the same charge brought against Upshaw. Although the EEOC dismissed Upshaw's claim, she asserts that Ford's response misrepresented the facts because she learned during discovery that several of the safety violations attributable to the other employees were more serious infractions, and that she

was the only salaried personnel at the Sharonville plant to have been disciplined for failing to wear a safety vest.

### d.   November 4, 2004 lawsuit

On November 4, 2004, Upshaw filed a complaint in the United States District Court for the Southern District of Ohio, alleging that Ford discriminated against her on the basis of her race and sex by failing to promote her to Salary Grade 7 and by subjecting her to heightened scrutiny.

### 3.   Ford's documentation of Upshaw's complaints

### a.   Compilation of timeline following Upshaw's August 2003 EEOC charge

After transferring to the Sharonville plant in 2001, Upshaw filed numerous complaints with the Department of Human Resources regarding various disputes she had with hourly employees, salaried employees, and the union.  These complaints were handled by Human Resources employees Brandee Hughes-Sharp and Nikolas Johnson, and consumed a significant amount of their time.  Despite her many interpersonal issues with other employees, including her supervisors, Upshaw's 2001 through 2005 annual performance reviews were generally positive.

Five days after Upshaw filed her August 2003 EEOC charge, Gerald Taylor, the Human Resources personnel manager for four Ford plants, wrote the following note documenting a conversation he had with Robert Brooks and James L. Brooks, another Human Resources employee:

> Discussed with J[ames] Brooks and Robert Brooks the possibility of looking into the *complaint activity* of Carolyn Upshaw since it seems almost daily people are investigating her complaints.  The # of complaints, time invested & outcome of these investigations. [sic] That if the data reveal excessive activity w/ little or no results, then write it up for termination and I will evaluate if it warrants said release.

(Joint Appendix ("JA") 779-80) (emphasis added).  In his deposition, Taylor testified that the term "complaint activity" referred to Upshaw's *internal* complaints— "the daily

traffic, the charges, the investigations, and the results of those"—not her recent EEOC charge. (JA 539-40.) In October 2003, James Brooks began working with Hughes-Sharp to compile a "timeline" of Upshaw's employment for Taylor's review.

### b.     Request for discipline following Upshaw's lawsuit

On December 7, 2004, approximately one month after Upshaw filed her lawsuit, Hughes-Sharp emailed Taylor to arrange a conference call to discuss the timeline that James Brooks and Hughes-Sharp were preparing. On or about December 14, 2004, James Brooks emailed Taylor a draft request for disciplinary action against Upshaw. At deposition, Brooks explained that he sought Taylor's permission to terminate Upshaw "on the basis that the numerous complaints and problems that she created for [Ford], the fact that her nitpicking was requiring almost full time of two, approximately two people in the [Human Resources] section[, specifically, Hughes-Sharp and Johnson,] to handle these complaints and issues and that at some point, we needed to stop this." (JA 445.) Taylor did not take immediate action on the request, and in the interim, the following events occurred.

### 4.     Events preceding Upshaw's March 2005 termination

### a.     Upshaw's scrap reports

At Ford, "scrap" consists of manufactured parts that cannot be used for their intended purpose. Ford requires an accurate accounting of the amount of scrap produced on each shift for cost, quality, and inventory control purposes. Although Upshaw submitted affidavits of other Ford employees noting that scrap counts were generally imprecise and that it was "standard practice to estimate scrap numbers," (JA 335), she concedes that in 2005, her supervisor, Maria Bradfish, consistently noted that Upshaw needed to reduce her daily scrap count to receive a higher performance rating.

Upshaw's team of hourly employees selected Gary Barrett and David Gibson as their shift "coordinators." Coordinators are hourly employees responsible for collecting and counting scrap accumulated at the end of a shift and reporting the amount to the supervisor, who enters the number in Ford's internal reporting system. On January 10,

2005, Gibson informed his union representative that Upshaw was misreporting the amount of scrap produced on her shift.  Gibson asserted that Upshaw had pressured him to under-report the scrap numbers, and that when he had refused, she had lowered the count in her reports.  Gibson supported his allegations with documented discrepancies between Upshaw's reporting occurring from January 4, 2005 through January 7, 2005, and his handwritten scrap records and transcripts of electronic pages sent between him and Upshaw regarding shift scrap count during the same time period.   Bradfish questioned Upshaw about Gibson's allegations on January 11, 2005, and Upshaw acknowledged that there were discrepancies between the numbers Gibson had reported to her and those she had recorded in the system.  The Human Resources Department subsequently conducted an investigation and found merit to Gibson's claims.

After reporting Upshaw to the union representative, Gibson also formally complained to Ford that Upshaw had harassed him and retaliated against him when he had refused to lower the scrap count.  Gibson claimed that following his refusal to lower the scrap count, Upshaw removed him from his position as coordinator and assigned him to work on the line, where she "birddogged"—closely monitored—him and denied him breaks.  Ford found Upshaw's actions inappropriate and concluded that she had violated the company's policy prohibiting retaliation against employees.

> b.     *PMHV incidents*

In February 2005, various Ford employees reported that Upshaw had violated Ford's safety rules regulating the operation of personnel scooters ("PMHVs").  Under Ford's written PMHV policy, employees must perform a thorough daily inspection of the equipment, document the results, and take any necessary corrective action before using a vehicle. In May 2004, Upshaw was counseled[2] for not completing her inspection and report prior to using a PMHV, and she was later formally reported for violating Ford's PMHV policy on February 8, 11, and 15, 2005.  Upshaw admitted that she did

---

[2]At deposition, Robert Brooks explained Ford's concept of "coaching and counseling": "That's not formal discipline . . . . That's where the person's supervisor, if it's a performance issue, will bring a person in the office and coach or counsel him."  (JA 471.)

not always conduct a pre-use PMHV inspection, but she submitted affidavits by other employees stating that, despite its written policy, Ford allowed employees to use PMHVs without inspection until lunchtime during each shift.

### c.        Dispute with union representative

Under the terms of Ford's collective bargaining agreement with the union, when union representatives make health and safety complaints—*i.e.* grievances filed by the union regarding plant safety risks and concerns that need immediate attention—management must respond within twenty-four hours. In early March 2005, a union representative asked Upshaw to assist him in addressing eighteen health and safety complaints raised in her department. On March 3, 2005, the union representative wrote a note to Bradfish informing her that Upshaw refused to accept the list, and told him that health and safety was not her responsibility and that he was not following the proper procedure. Bradfish subsequently asked Upshaw to walk through the department with the representative, develop proposed corrective actions for each complaint, and sign and return the complaints to Bradfish within twenty-four hours. Although Upshaw completed the walk-through, she returned the forms to Bradfish unsigned. Bradfish reported Upshaw's actions to Human Resources, which cited Upshaw for insubordination.

### 5.        Upshaw's termination

Following the foregoing events, James Brooks sent Taylor a second request for disciplinary action concerning Upshaw. On March 22, 2005, following Brooks's submission of a draft of the request, Taylor emailed Brooks, stating: "Looks like we are gunny-saking [sic] her." (JA 785.) Taylor explained at deposition that he had made the comment because he knew Ford had a good case, and he wanted Brooks to take out everything that was not "germane" to the four allegations so that it did not look like Ford was firing Upshaw unfairly.

Brooks finalized the request on March 23, 2005, and sought Upshaw's termination based on a combination of the following four incidents—(1) falsification of

company records by under-reporting scrap; (2) harassment and retaliation against Gibson for refusing to falsify the scrap count; (3) multiple violations of company safety policy related to PMHVs and repeated failures to wear a required safety vest; and (4) insubordination.  The request further provided:

> Ms. Upshaw has been non-responsive to the counseling, management has been unable to convince her that she is in need of improvement of her interpersonal skills, establishing teamwork and developing working relationships with those around her.  These four incidents are examples of Ms. Upshaw's total disregard of Company policies and requirements and of the behaviors required of a supervisor . . . The combination of issues outlined herein should certainly support the Plant's request for termination.

(JA 753.)   The request also specified that Human Resources had not considered Upshaw's EEOC claims in recommending her termination.  Taylor reviewed the request and gave his approval, and Upshaw was terminated, effective March 29, 2005.

## B.  Procedural History

Following her termination, Upshaw filed an additional charge with the EEOC, claiming that Ford discharged her in retaliation for her EEOC charges, and, on August 24, 2005, Upshaw amended her 2004 complaint to add a retaliation claim.  Upshaw's First Amended Complaint sets forth the following claims for relief: Counts I and II, race discrimination and unlawful retaliation under 42 U.S.C. §§ 2000e-2, 2000e-3; Count III, race discrimination under 42 U.S.C. § 1981; Count IV, race discrimination under Ohio Revised Code § 4112.02(A); Count V, unlawful retaliation under Ohio Revised Code § 4112.02(I); and Count VI, wrongful discrimination in contravention of Ohio public policy.  The amended complaint raises no claim of discrimination on the basis of sex. The amended complaint does seek reinstatement of employment with two years of grade and pay differential or an award of front pay, a judgment for compensatory damages, equitable relief, punitive damages, and reasonable attorney fees and costs.

On March 16, 2007, Ford moved for summary judgment on all six claims, and on June 28, 2007, the court granted the motion and dismissed Upshaw's complaint in its entirety.  The court found that: (1) Upshaw had limited her discrimination claims to race

by failing to argue expressly that her claims were premised on gender; (2) Upshaw's affidavit should be disregarded because it contained improper legal argument, speculation, personal opinions, and contradictions; (3) Upshaw failed to demonstrate a genuine issue of material fact to rebut Ford's proffered legitimate non-discriminatory reasons for not promoting her and for terminating her; and (4) Upshaw's Ohio public policy claim was preempted by Title VII.

On July 9, 2007, Upshaw filed a motion to alter or amend the district court's judgment under Federal Rules of Civil Procedure 59(a) and (e), or, alternatively, for relief from judgment under Federal Rules of Civil Procedure 60(b)(1) and (b)(6). Upshaw attached to her motion several transcripts of depositions, asserting that the court made numerous factual and legal errors in its decision. On February 6, 2008, the court denied the motion. Upshaw now appeals.

## II. ANALYSIS

### A. Standard of review

We review de novo a district court's order granting summary judgment. *Sullivan v. Or. Ford, Inc.*, 559 F.3d 594 (6th Cir. 2009). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 578 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). In reviewing the district court's decision to grant summary judgment, we must view all evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.    The district court did not err in granting Ford summary judgment on Upshaw's failure-to-promote claim

Upshaw contends that Ford discriminated against her by giving in-series promotions to similarly-situated white males while continually denying her such promotions because of her race. Title VII forbids employers from discriminating against

"any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

At the summary-judgment stage, a plaintiff must adduce either direct or circumstantial evidence to prevail on a Title VII race-discrimination claim. *See DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Because Upshaw offers no direct evidence of racial discrimination, the *McDonnell Douglas/Burdine* burden-shifting framework applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *DiCarlo*, 358 F.3d at 414. First, the plaintiff must make out a prima facie case of race discrimination, after which the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000). If the employer carries its burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual. *Id.*; *DiCarlo*, 358 F.3d at 414-15. Throughout this burden-shifting process, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *DiCarlo*, 358 F.3d at 415 (internal citation omitted).

### 1.    *Prima facie case*

To make out a prima facie case of race discrimination in the failure-to-promote context, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for promotion; (3) she was "considered for and denied the promotion"; and (4) "other employees of similar qualification who were not members of the protected class received promotions." *Grizzel v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006) (citing *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003)). Ford concedes that Upshaw satisfies the first and third prongs but asserts that because her evaluations were below "Excellent Plus," she was not qualified for an in-series promotion.

To establish that she is qualified for the position, a Title VII plaintiff need only show that she satisfied an employer's "objective" qualifications. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575-76 (6th Cir. 2003) (en banc) (holding that the assessment of qualifications at the prima facie stage includes only "*objective* qualifications") (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998) (en banc) (pointing out that "an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination")). Although it is undisputed that Upshaw never received an "Excellent Plus" rating during the relevant time period, Ford did not uniformly apply its in-series promotion criteria. Such disparate application of the criteria implies that Ford could have relaxed intentionally its requirements for Fletcher, Green, and Alexander—two white males and one African-American male—all of whom were promoted in 2002, with lower-than "Excellent Plus" ratings. *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005) ("[T]o demonstrate that he was qualified for the position, a Title VII plaintiff need only show that he or she satisfied an employer's objective qualifications."). Thus, viewing the facts in the light most favorable to Upshaw, because Ford did not adhere to its stated criteria for granting in-series promotions, she has met her burden of establishing that she was qualified.

The fourth element of the *McDonnell Douglas* test requires a plaintiff to show that a similarly-situated individual outside his protected class was promoted. *See, e.g.*, *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572-73 (6th Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802). Upshaw has established that she was similarly situated to Fletcher and Green, two white males, because they were also Salary Grade 6 production supervisors applying for in-series promotions in 2002. Upshaw has also shown that although Fletcher and Green were promoted with ratings of "Excellent" in 2002, she was passed over for in-series promotions in 2003, 2004, and 2005, when she was rated "Excellent." She thus successfully established that Fletcher and Green, similarly-situated employees outside of the protected class, were promoted, while she was not. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

2.    *Articulated reason for adverse action*

Given that Upshaw has established a prima facie case of discrimination on the basis of race, Ford must articulate a legitimate non-discriminatory reason for promoting Fletcher and Green in 2002, but failing to promote Upshaw from 2003 through 2005. *See Burdine*, 450 U.S. at 252.  This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *see also Bd. of Trustees of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 n.2 (1978) (noting that "the employer's burden is satisfied if he simply 'explains what he has done' or 'produces evidence of legitimate nondiscriminatory reasons'").

In comparing Upshaw's treatment to that of Fletcher and Green, we first look to the testimony of Robert Brooks.  Brooks testified that he mistakenly promoted Fletcher, Green, and Alexander in 2002, and did not realize that they had received lower ratings than the purportedly mandatory "Excellent Plus" evaluation until he noticed the error after submitting Ford's EEOC response to Upshaw's August 2003 charge.  Brooks accepted responsibility for the error but explained that in investigating the promotions, he had learned that an employee in his department gave "the promotion without [his] concurrence, and [he] didn't find out about it until after the promotion was completed." (JA 464.)

Courts have held that an employer's explanation of an admitted mistake in considering and awarding a promotion to one employee over another constitutes a legitimate nondiscriminatory reason.  *Cf. Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1236 (6th Cir. 1991) ("Refusal to promote based upon negligence, oversight, or inadvertence is not actionable."); s*ee Kidd v. MBNA Am. Bank, N.A.*, 93 F. App'x 399, 401 (3d Cir. 2004) (the fact that employer claimed to have made a mistake in considering plaintiff's application did not suggest a weakness, implausibility, or incoherency in employer's proffered explanation); *Harrison v. Hous. Auth. of City of Pittsburgh*, 111 F. App'x 95, 97 (3d Cir. 2004) (employer's purported "mistake" constituted a legitimate nondiscriminatory reason for employer's failure to

promote plaintiff); *see Leigh v. Bureau of State Lottery*, 876 F.2d 104, at *5 (6th Cir. 1989) (Table) (concluding that defendant's assertion that its mistake in failing to hire plaintiff constituted a legitimate non-discriminatory reason).  Given that Fletcher and Green were promoted based on faulty performance ratings, not known until discovery, and that Upshaw failed to rebut this testimony, Ford successfully met its burden of establishing a legitimate non-discriminatory reason for not granting Upshaw an in-series promotion between 2003 and 2005.

    *3.     Pretext*

    A plaintiff may establish that an employer's stated reason for its employment action was pretextual by showing that the reason (1) had no basis in fact, (2) did not actually motivate the challenged conduct, or (3) is insufficient to explain the challenged conduct.  *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).  The plaintiff must produce "sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him."  *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (alteration in original).  "The jury may not reject an employer's explanation . . . unless there is a sufficient basis *in the evidence* for doing so."  *Manzer*, 29 F.3d at 1083.  If the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be deemed pretextual even if it was erroneous.  *See Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 559 (6th Cir. 2009) (quoting *Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (noting that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect")).

    Upshaw argues that Ford's error in its EEOC response and its changing defense for Fletcher's and Green's promotions are evidence that its claim of "mistake" is pretext for discrimination.  She asserts that the fact that Ford changed its original defense before the EEOC—that  Fletcher and Green were rated "Excellent Plus"—with its later claim

that the two men were promoted accidentally, shows "repeated and intentional mendacity, which the jury could conclude is evidence of discrimination." (Upshaw Reply Br. 5.) However, Upshaw's own speculation that Ford knowingly violated its own internal procedures, unsupported by any allegation of fact, is not enough. *See Brennan v. Tractor Supply Co.*, 237 F. App'x 9, 19-20 (6th Cir. 2007) ("[M]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment . . . . [A] court may not reject an employer's explanation [of its action] unless there is sufficient basis *in the evidence* for doing so.") (internal citations omitted). Further, regardless of whether Brooks's claim of mistake is legitimate, Upshaw's evidence does not establish that *discrimination* was the real reason for Ford's action. *See Samadi v. Ohio Bureau of Employment Servs.*, 48 F. App'x 573, 575 (6th Cir. 2002) (finding that employee failed to establish that employer's reasons for hiring someone other than plaintiff were pretext when the hired individual "had superior experience [and] qualifications" for the position); *see also St. Mary's Honor Ctr.*, 509 U.S. at 515 (noting that "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason"); *see also Rufo v. Dave & Busters, Inc.*, No. 06-3111, 2007 WL 247891, at *4 (6th Cir. Jan. 31, 2007) (explaining that plaintiff failed to offer evidence to "call into question the veracity of [employer's motivations]" and did not establish that employer based its decision on discrimination).

We also reject Upshaw's assertion that Ford's claim of mistake is belied by a January 23, 2002 email from a Sharonville Human Resources associate. The email requests that supervisors submit names of candidates for promotion, and adds, "[i]f you are considering an employee for an in-series promotion outside of the guidelines, you must contact your HR Associate." (JA 741.) Although Brooks testified that in 2001, he changed the standards for in-series promotions so that only employees with twenty-four months of service in their pay grade would be eligible, the referenced email demonstrates that, on occasion, Ford promoted certain employees who did not meet its standard requirements. However, given that neither party has put forth evidence

suggesting that Fletcher and Green were intentionally recommended for an "outside-guidelines" promotion, Upshaw's argument lacks merit.

Therefore, because Upshaw has failed to raise a genuine issue of material fact as to whether Ford's claim of mistake was pretext for race discrimination, we affirm the district court's grant of summary judgment to Ford on Upshaw's failure-to-promote claim.

## C.  The district court erred in granting Ford summary judgment on Upshaw's retaliation claim

Upshaw also alleges that Ford unlawfully terminated her in retaliation for her numerous EEOC charges and her initiation of this lawsuit.  Title VII prohibits an employer from retaliating against an employee for filing an EEOC charge.  *See* 42 U.S.C. § 2000e-3(a).  Once again, because Upshaw offers no direct evidence of racial discrimination, the *McDonnell Douglas/Burdine* burden-shifting framework applies.  *See McDonnell Douglas*, 411 U.S. at 802 ; *Burdine*, 450 U.S. at 252-53; *DiCarlo*, 358 F.3d at 414.

### 1.    *Prima facie case*

To make out a prima facie case of retaliation, Upshaw "must establish that: (1) she engaged in Title VII-protected activity; (2) [Ford] knew that she engaged in the protected activity; (3) [Ford] subsequently took an adverse employment action against [her]; and (4) the adverse action was causally connected to the protected activity."  *See Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009).  The parties dispute only the fourth element—whether Upshaw established a causal connection between her various EEOC charges and Ford's decision to terminate her.  To establish a causal connection, a plaintiff must "'proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'"  *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (quoting *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990) (citations omitted)); *see also Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 543 (6th Cir. 2003) ("[T]he plaintiff must produce sufficient evidence from which one could draw an inference that the

employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects.").  The burden of proof at the prima facie stage is "minimal"; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the protected activity and the retaliatory action.  *Avery*, 104 F.3d at 861 ("Further, to establish the element of causal link, a plaintiff is required to proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action.") (internal citations and quotation marks omitted).

The district court determined that Upshaw met her burden of establishing a prima facie case based on the close temporal proximity between her EEOC filings and her termination:

> While Upshaw's termination came almost 19 months after her initial EEOC charge, Upshaw made two additional charges and filed her lawsuit only four months before she was fired.  Given the facts discussed above [*i.e.*, Taylor's handwritten notes, and his discussion about Upshaw's potential termination with James Brooks and Robert Brooks, occurred within days of Ford's knowledge of Upshaw's August 2003 EEOC charge,] and the relatively easy burden of establishing a prima facie case, the Court assumes for purposes of summary judgment that Upshaw could raise an inference that her charges and her termination were not 'wholly unrelated.'

(JA 225.)  We agree.

We have held that the combination of close temporal proximity between an employer's heightened scrutiny and that plaintiff's filing of an EEOC charge is sufficient "to establish the causal nexus needed to establish a prima facie case" of retaliation.  *Hamilton v. Gen. Elec.*, 556 F.3d 428, 436 (6th Cir. 2009) (holding that summary judgment for defendant was inappropriate where plaintiff was subjected to heightened scrutiny a few months after he filed an age-discrimination claim with the EEOC).  Here, Upshaw has proffered evidence that Ford subjected her to heightened scrutiny soon after she filed her 2003 EEOC charge.  It is undisputed that Hughes-Sharp and Brooks began developing a timeline of Upshaw's employment in fall 2003, and that they requested that other Ford employees submit information about Upshaw's complaints to Human

Resources.  Ford's heightened scrutiny is evidenced by a December 6, 2004 email from Ford employee Mark Striker to Hughes-Sharp, stating: "I would like to talk to you about this.  I would assume that this is the type of documentation that you are interested in with regards to Upshaw.  It seems to me that everyone has problems dealing with Upshaw. Something needs to be done with her, or we will have good people leaving, and we will still be dealing with her." (JA 773).  An earlier email from Ronald Campbell, another employee, to Hughes-Sharp relaying the details of a dispute between Upshaw and another salaried employee, stated, "I do know that [Human Resources] is doing some investigations, but I am concerned with the number of different people in the organization that currently have or have had issues with Carolyn.  Maybe she needs to be reassigned in the interim?" (JA 167.)  Given the close temporal proximity between Upshaw's August 2003 EEOC charge and Ford's request for information from other employees documenting Upshaw's complaint activity, and Brooks's request for discipline, a reasonable juror could find that Upshaw has established a prima facie case of retaliation.

### 2.    *Articulated legitimate non-discriminatory reasons*

Ford cites four specific reasons for Upshaw's termination: (1) falsification of company records by under-reporting scrap; (2) harassment of and retaliation against Gibson; (3) violation of company safety policies on multiple occasions by driving an uninspected PMHV, and continually failing to wear a required safety vest; and (4) insubordination.  Ford has submitted as evidence its "Standards of Corporate Conduct," stating that "[a]ny Ford employee who violates the law or Company policy is subject to disciplinary action, which may include termination of employment." (JA 310.)  As we have noted, Ford's burden is merely one of production, not persuasion, and it does not involve a credibility assessment.  *Reeves*, 530 U.S. at 142.  Ford's explanations for Upshaw's termination meet this burden, so we turn to the question of whether Upshaw has established that these proffered reasons are pretextual.

*3.      Pretext*

Upshaw argues that because there is evidence that none of Ford's proffered legitimate non-discriminatory reasons would warrant the termination of a supervisor on its own or together, there is a genuine issue of material fact as to whether, considered in context, they were pretextual.  We agree.

Our recent decision in *Hamilton v. General Electric* aids our analysis.  *See* 556 F.3d at 436-37.  In *Hamilton*, plaintiff, a terminated employee, sued his former employer, General Electric ("GE"), alleging violations of the Kentucky Civil Rights Act.  *Id*. at 430.  Plaintiff alleged that after he had filed an age-discrimination claim against GE with the EEOC, his supervisors "intensified their scrutiny of his work and harassed him more than they ever had before."  *Id*. at 432.  In 2005, GE terminated plaintiff when he allegedly engaged in "unacceptable conduct"; the parties disputed the details of the incident.  *Id*. at 432-33.  The district court granted summary judgment for GE, but we reversed, explaining that "a reasonable fact-finder could determine that GE waited for, and ultimately contrived, a reason to terminate Hamilton to cloak its true, retaliatory motive for firing him."  *Id*. at 437.  We explained that because plaintiff alleged that his employer heightened its scrutiny and supervision of him following his filing of an age-discrimination charge with the EEOC to find a "seemingly legitimate reason to fire him," he created a question of material fact as to pretext.  *Id*. at 437; *see also Jones v. Potter*, 488 F.3d 397, 408 (6th Cir. 2007) (noting that when an "employer . . . waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee," the employer's actions constitute "the very definition of pretext").

As in *Hamilton*, Upshaw has raised a genuine issue of material fact as to whether Ford's proffered reasons for her termination were contrived following her many EEOC charges and the filing of this lawsuit.  As a threshold matter, Upshaw has established that two of Ford's four proffered reasons for terminating Upshaw—safety violations and her failure to timely resolve union health and safety complaints—do not typically warrant *any* formal discipline at Ford's Sharonville plant, let alone termination.  First, although

Ford's response to the EEOC in summer 2004 purportedly named seven other salaried employees who were disciplined for violating "corporate Safety Rules" at the Sharonville plant, the violations were actually more serious than those committed by Upshaw.  Moreover, Upshaw submitted affidavits and testimony by other Ford employees expressly stating that no other  supervisor has ever been disciplined for failing to wear a safety vest or driving an uninspected PMHV.  In regard to the safety-vest violation, Robert Brooks stated that "[Upshaw] is the only salary person I know" who was disciplined for failing to comply with the rules regarding the wearing of protective safety vests.  (JA 489.)  Brooks also admitted that he had never heard of an individual at the Sharonville plant being disciplined or terminated for being "cited on one occasion or numerous occasions for driving a [PMHV] without it having been inspected."  (JA 482.)  Further, Stephen Green, another Sharonville production supervisor, explained Ford's PMHV inspection policy as follows:

> **Question:** Do you know of anybody in the plant who has [driven a vehicle that had not been inspected]?
>
> **Green:** Oh yeah, I have had to page my techs to make sure that the vehicles were inspected.
>
> **Question:** Now, is it common practice for [a Ford employee] at lunch break to send out a page either reminding everyone to inspect their vehicles or sometimes even giving a list of vehicles that had not been inspected?
>
> **Green:** Yes.
>
> **Question:** How often does that happen?
>
> **Green:** Maybe nightly, night supervisor . . .
>
> **Question:** Have you ever heard of anybody being terminated from the Sharonville plant for driving a vehicle that had not been inspected?
>
> **Green:** No.
>
> **Question:** Would it be your knowledge or understanding that driving an uninspected vehicle for a first offense is a terminable offense at Ford?
>
> **Green:** No.

(*See* JA 498-500.) Given the foregoing statements, a jury could reasonably conclude that the safety violations used to justify terminating Upshaw were contrived to mask what was, in fact, retaliation for her complaint activity.

Second, other Ford employees and former Ford employees testified that no supervisor could be expected to resolve eighteen health and safety complaints by a union representative within a twenty-four-hour period, and that they did not "know of anybody who has ever been disciplined or fired for failing to complete health and safety forms within 24 hours." (JA 501.)  Stephen Green stated that to his knowledge, a failure to complete health and safety forms within twenty-four hours was not a terminable offense. (JA 501.)  Further, former Ford production supervisor, Mike Rubin, explained in an affidavit that:

> 20.   Standard practice at the Ford Sharonville plant was that health and safety reports were typically initiated during the day shift, because that was when all the engineers and support personnel were on duty to assist in correcting any safety violations.
>
> 21.   It was never standard practice, and would have been highly unusual, for health and safety reports to be initiated on second shift.
>
> 22.   It would also be highly unusual for 18 health and safety reports to be dumped on a production supervisor, let alone a second shift supervisor, at one time.
>
> 23.   It would also be highly unusual and excessive for a production supervisor, and especially a production supervisor, to be given that many health and safety reports and only 24 hours to complete them.
>
> 24.   I am not aware of any production supervisor other than [] Upshaw who was disciplined or terminated for this alleged reason.

(JA 338.)  Finally, though Human Resources cited Upshaw for insubordination for her failure to timely resolve the union complaints, Bradfish testified that she did not cite Upshaw for insubordination for her failure to timely resolve the union complaints in

January 2005 and that she could not recall ever asking Upshaw to "do something" that she did not do.  (JA 425.)

Given that Upshaw has succeeded in raising a question as to whether the safety violations and insubordination were genuine reasons for her termination, we must turn our attention to the two, more serious of Ford's allegations—inaccurate scrap reporting and retaliation against an hourly employee.

Upshaw concedes that some of her scrap reports from early January 2005 were inaccurate when compared with the reports by Gibson; however, she argues that Ford had never previously treated misreporting or estimating scrap as a serious offense that would result in the discipline or termination of a supervisor.  Ford counters that Upshaw's underreported scrap was a serious problem, and Taylor testified at deposition that Ford considers a "first time inaccurate or incorrect reporting of scrap" to be grounds for termination. (JA 547.)  Further, James Brooks testified that if Human Resources had ever been aware of other production supervisors who had misrepresented scrap numbers, the company "would have done something."  (JA 447.)   Upshaw introduced evidence calling Ford's claims into doubt.  She submitted an affidavit by Mike Rubin, asserting that he had reported another former supervisor to the Sharonville superintendents for falsifying scrap reports, but they did not take "any [sic] disciplinary action against [the supervisor] because the increased production records made them look good."  (JA 336.)  Rubin also stated that "[t]here was never any emphasis or requirement at the Ford Sharonville plant to have completely accurate scrap numbers," and explained that he was "not aware of any production supervisor who was ever terminated for reporting false or incorrect scrap numbers."  (JA 335.)   Considering the evidence in the light most favorable to Upshaw, there is clearly a question as to whether Ford actually treats the falsification of scrap as an offense that could lead to termination.

This leaves the issue of Upshaw's retaliation against Gibson.  Upshaw concedes that under Ford's policies, retaliation against an employee who reports an infraction to management could warrant discipline, but she argues that the evidence does not support Ford's allegations that she retaliated against Gibson.  Gibson informed Ford that after

he refused to falsify scrap reports for Upshaw, she reassigned him to the line, hounded him, and refused to let him take breaks.  Upshaw explains, however, that she reassigned Gibson to the line because he asked to change his position; she clarified that when a coordinator wants to change his position, his supervisor is expected to comply, so she acceded to Gibson's request to work the "auto riveter" job.  (JA 601.)  Bradfish's January 12, 2005 email to James Brooks notes that Upshaw had not "take[n] away" Gibson's coordinator position or his pager, supporting Upshaw's testimony.  (JA 739.) Moreover, Upshaw testified that she had stood behind Gibson during his shift because his auto riveter had malfunctioned, and common practice at the plant required her to supervise him while he operated the machine manually.  Affidavits and testimony from other supervisors corroborate Upshaw's testimony.  For instance, at deposition, Stephen Green testified as follows:

> **Question:** If a machine was down, did Doug Baur ever instruct any of the production supervisors to stand at the down operation?
>
> **Green:** Sometimes he did.  Wanted to make sure it happened.
>
> **Question:** Okay.  And what would be the purpose for the production supervisor to stand with the downed operation?
>
> **Green:** To pretty much direct the flow of the maintenance activities. . . .
>
> **Question:**  So if there is a down machine, typically you would be standing right there and supervising the production flow to make sure that everything . . . gets worked around the down machine?
>
> **Green:** Yes.
>
> **Question:** Did anybody accuse you of birddogging them for standing at a down machine?
>
> **Green:** Yes.
>
> **Question:** Who does that?
>
> **Green:** Techs.
>
> **Question:** They don't like it?
>
> **Green:** Nobody likes somebody standing over your shoulder.
>
> **Question:** But you, as the production supervisor, have to do that, you are instructed to do that?

**Green:** I'm going to be there whether I'm told or not.  I'll be there, yes. (JA 502-04.)

In considering a motion for summary judgment, "[t]he judge's function . . . is limited to determining whether sufficient evidence has been presented to make the issue a proper jury question, and not to judge the evidence and make findings of fact." *Bultema v. United States*, 359 F.3d 379, 382 (6th Cir. 2004) (quoting *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435-36 (6th Cir. 1987)).  In arguing that "[e]ven if Upshaw could show that Ford fired her based on a mistake, or even based on an arbitrary desire to get rid of her, she must do more . . . ." (Partial Concurrence and Dissent p. 26), the dissent and Ford appear to have evaluated the evidence and determined that Upshaw would be unable to prevail at trial on the issue of whether Ford's rationale for her termination was pretextual.  (*See* Ford Br. 52.)  Upshaw may in fact fail to win at trial, but such an evaluation is simply improper at the summary judgment stage of proceedings.  "Based on the foregoing evidence, a reasonable juror could conclude that Upshaw did not retaliate against Gibson.  Although Ford is entitled to terminate an employee for an actual violation of its internal policies, Upshaw has introduced evidence suggesting that these "actual violations" were nothing more than "trumped up" charges. *See Jones*, 488 F.3d at 408 (finding it improper for an "employer . . . [to] wait[] for a legal, legitimate reason to fortuitously materialize, and then use [] it to cover up his true, longstanding motivations for firing the employee").  The jury should resolve this question.  *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004); *see also White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008).  Accordingly, we reverse the district court's grant of summary judgment on Upshaw's retaliation claim and remand that claim for trial.

**D.      Evidentiary Rulings**

As an ancillary matter, Upshaw claims that the district court erred by failing to consider her sex discrimination claims and the affidavits of Tracy McCullough and Eugene ("Cosby") Calbert, two African-American former Ford employees.  For the

reasons provided by the district court, we affirm its finding that Upshaw did not assert a cognizable sex discrimination claim and affirm its exclusion of the affidavits.

Upshaw also argues that the district court erred by striking her forty-four-page, 195-paragraph affidavit.  We review decisions regarding the admission and exclusion of evidence for abuse of discretion.  *See Finch v. Monumental Life Ins. Co.*, 820 F.2d 1426, 1431-32 (6th Cir. 1987).  The district court abused its discretion by striking the entire affidavit, rather than striking only the *inadmissible* portions thereof.  *See Giles v. Univ. of Toledo*, 241 F.R.D. 466, 469 (N.D. Ohio 2007) ("In resolving a motion to strike, the Court should use 'a scalpel, not a butcher knife,' . . . strik[ing] portions of affidavits that do not satisfy the requirements of Rule 56(e).").  However, because the information in the affidavit was cumulative of Upshaw's deposition testimony, any error in striking the affidavit was harmless and does not warrant reversal.

### III.  CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's grant of summary judgment to Ford on Upshaw's failure-to-promote claim, but **REVERSE** its judgment on Upshaw's retaliation claim and **REMAND** that claim for trial.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part.  I join the majority opinion except for section II(C), from which I respectfully dissent because there is no material issue of fact as to whether Ford's stated reasons for firing Upshaw were pretextual.

True, the parties disagree about the incidents serving as the basis for Upshaw's termination.  Upshaw produced evidence that two of Ford's stated reasons for her firing (minor safety violations and a failure to sign a union health and safety grievance) were not, in actual practice, terminable offenses.  Also, Upshaw denies falsifying the scrap reports or retaliating against the hourly employee who reported her; moreover, she presented evidence that it was common for supervisors to estimate scrap counts and to monitor employees manually operating "down" machines.

But although there are factual disputes regarding the merits of Ford's reasons for firing Upshaw, the jury would not be called upon to decide whether Ford was justified in firing her.  Even if Upshaw could show that Ford fired her based on a mistake, or even based on an arbitrary desire to get rid of her, she must do more:  She must demonstrate that Ford's real reason for firing her was to retaliate against her for pursuing EEOC claims.

Resolution in Upshaw's favor of the disputes the majority characterizes as material would get us no further than the situation presented by Upshaw's racial discrimination claims.  Under the majority's reasoning, those claims should also go to the jury, inasmuch as Upshaw presented evidence — indeed, Ford admitted — that the company promoted white employees who were unqualified.  Although Ford claimed the promotions were mistakes, a jury could *assume* that Ford was lying to cover up its racial animus, just as a jury could *assume* that any error in firing Upshaw was a pretext to hide its retaliatory motive.  We have held that "[t]he jury may not reject an employer's explanation, however, unless there is a sufficient basis *in the evidence* for doing so."

*Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994) (emphasis in original). "To allow the jury simply to refuse to believe the employer's explanation would subtly, but inarguably, shift the burden of persuasion from the plaintiff to the defendant, which we must not permit." *Id.* "[O]nce the employer has come forward with a nondiscriminatory reason for [the challenged action], we hold that the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Id.* (citations omitted).

Upshaw points to the August 26, 2003, meeting among Robert Brooks, Jim Brooks, and Gerald Taylor to discuss Upshaw's "complaint activity" as evidence that Ford's alleged reasons were pretextual. This meeting occurred only two weeks after Upshaw filed an EEOC charge and on the same day that Robert Brooks submitted Ford's response. Upshaw also notes that shortly after she filed the present lawsuit in November 2004, Brandee Hughes-Sharp and Jim Brooks requested documentation from employees regarding issues that they had with Upshaw. When asked if he was "compiling that information with the view towards terminating Carolyn Upshaw," Jim Brooks responded that he "had hoped to." In December 2004, the Salaried Personnel office presented the documents they had accumulated to Gerald Taylor, along with a recommendation that Upshaw be fired. Taylor testified that although he thought there was a "solid case" for terminating Upshaw, some of the e-mails that Salaried Personnel had submitted made it look like the company was trying to "gunny sack" her.

Viewing this evidence in the light most favorable to Upshaw, as we must, she has not provided sufficient evidence of pretext to survive summary judgment. For one thing, Upshaw filed EEOC charges so frequently, nearly any action Ford took would have been relatively close in time to one of her filings. The August 2003 meeting to discuss her "complaints" came many months before she was fired in March 2005. The most recent EEOC charge she had filed prior to her termination was in June 2004. And Ford did not fire Upshaw until four months after she filed this lawsuit.

Moreover, Jim Brooks and Gerald Taylor both testified on deposition that the August 26 discussion was related to internal complaints from and about Upshaw and had

nothing to do with her EEOC filings.  Taylor's notes on the meeting support this interpretation:  He wrote that "almost daily people are investigating her complaints" and observed that the human resources employees at Upshaw's facility had specific concerns with "[t]he # of complaints, time invested & outcome of these investigations."  Taylor advised "[t]hat if the data reveal excessive activity with little or no yield then write it up for termination and I will evaluate if it warrants said release."  These comments reveal that Taylor was concerned with the amount of time that the plant's human resources department was expending in internal investigations regarding Upshaw.  There is no evidence that Taylor meant "EEOC charges" when he wrote "complaints," other than the fact that this meeting was close in time to one of those charges.  There simply is not enough here from which the jury could find that Taylor must have been referring to protected activity by Upshaw.

As to the documentation compiled by human resources associates, Taylor found that although some of the e-mails he received presented insubstantial grievances against Upshaw, most of them made out a "solid case" for her termination.  Even so, Ford did not fire Upshaw until three months later and did not cite any of the information in that report as a reason for Upshaw's dismissal.  Again, other than the fact that human resources associates began soliciting employee feedback about Upshaw shortly after her November 2004 lawsuit, there is no evidence that the compilation of this report had anything to do with Upshaw's EEOC filings.

Whether Upshaw would be able "to prevail at trial on the issue of whether Ford's rationale for her termination was pretextual," Maj. Op. at 24, is immaterial.  Because Upshaw has not presented sufficient evidence from which a jury could find that Ford's actions were based on reasons prohibited by Title VII, I would affirm the district court's order of summary judgment in favor of Ford.